MEMORANDUM OF DECISION
This is an action for Termination of Parental Rights brought by the Department of Children and Families (DCF). The respondent, Marie P., is the biological mother of Amelia, Nadine, and Anthony. The respondent, Devone W., is the biological father of Amelia and Nadine. The respondent, Raymond J., is the biological father of Anthony.
PROCEDURAL BACKGROUND
On January 12, 1996, DCF filed a petition alleging that Amelia and Nadine were neglected in that the children were being denied proper care and attention physically, educationally, emotionally CT Page 627 or morally and the children were being permitted to live under conditions, circumstances or associations injurious to the children's well-being.
On January 12, 1996, the court granted an Order of Temporary Custody with regard to these children.
On July 30, 1996, the court found that Amelia and Nadine were neglected and committed them to the care and custody of DCF.
Anthony was born on October 30, 1996. DCF filed a neglect petition regarding Anthony and was granted an Order of Temporary Custody on December 26, 1996. The petitioner alleged that Anthony was being denied proper care and attention and was being permitted to live under conditions injurious to his well being. The petitioner also alleged that he was abused and had a condition which was the result of maltreatment, such as malnutrition, sexual molestation, deprivation of necessities, emotional maltreatment or cruel punishment.
On January 6, 1998, the court found that Anthony was neglected and committed him to DCF.
On May 14, 1998, DCF filed a petition for termination of parental rights of the respondent parents. With regard to Marie, the petitioner alleged that Amelia, Nadine and Anthony had been found in a prior proceeding to have been neglected and the mother had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in the lives of the children. Conn. Gen.Stat. § 17a-112 (c)(3)(B)(1). The petitioner also alleged that Amelia had been denied by acts of comission or omission, by the mother, the care, guidance or control necessary for her physical, educational, moral or emotional well-being. Conn. Gen. Stat. §17a-112 (c)(3)(C). The petitioner also alleged that Nadine and Anthony had been abandoned by their mother in the sense that she failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the children. Conn. Gen.Stat. § 17a-112 (c)(3)(A).
With regard to respondent, Devone, the petitioner alleged that Amelia and Nadine had been found in a prior proceeding to have been neglected and that the father had failed to achieve such degree of personal rehabilitation as would encourage the belief CT Page 628 that within a reasonable time, considering the age and needs of the children, he could assume a responsible position in the lives of the children. Conn. Gen. Stat. § 17a-112 (c)(3)(B)(1). The petitioner also alleged that there was no ongoing parent/child relationship that ordinarily develops as a result of a parent having met on a day-to-day basis, the physical, emotional, moral and educational needs of the children, and to allow further time for the establishment or reestablishment of the parent/child relationship would be detrimental to the best interests of the children. Conn. Gen. Stat. § 17a-112 (c)(3)(D).
With regard to the respondent, Raymond, the petitioner alleged that he has abandoned Anthony and that he has failed to rehabilitate within the meaning of the statute. Conn. Gen. Stat.
§ 17a-112 (c)(3)(A) and (B).
On June 18, 1998, the court ordered that continuing efforts for reunification were appropriate with regard to Devone and no longer appropriate with regard to Marie.
On the first day this case was scheduled for trial, Marie consented to termination of her parental rights with regard to Amelia, Nadine and Anthony.
Respondent, Raymond, did not appear for trial. He had been served in hand with the termination petition and therefore had proper notice of the proceedings. He had also appeared at several previous hearings and had counsel appointed for him. Accordingly, the court defaulted Raymond for failure to appear at trial.
Respondent, Devone, appeared for trial with counsel and contested the petition for termination of his parental rights.
FACTUAL FINDINGS
The court makes the following findings by clear and convincing evidence based on the testimony and exhibits presented in this case.
THE CHILDREN
Neglect petitions were originally brought for Amelia and Nadine because their mother, Marie, was engaged in substance abuse, her home was filthy and she had inadequate food for the children. Subsequently, it was determined that Amelia had also been CT Page 629 sexually abused by her mother. At the time of the filing of the neglect petitions, respondent, Devone, was incarcerated at McDougall Prison.
Amelia has been placed in several homes since she was committed to DCF and is currently in an intensive level therapeutic foster home. Amelia has serious specialized needs and has had to be placed in psychiatric hospitals four times since she was committed to DCF. The Children's Psychiatric Inpatient Service at Yale-New Haven Hospital diagnosed her with major depression, generalized anxiety disorder, attention deficit hyperactivity disorder, post traumatic stress disorder, and mild mental retardation. Amelia is very reactive to her environment and needs a structured, calm and very consistent environment.
Amelia has not seen her father since 1996 when he showed up unexpectantly at a visit that was scheduled to take place among Amelia, Nadine and Marie. When Devone refused to leave, the police had to be called. Amelia and Nadine were both upset by this incident. Amelia expressed fear that her father was going to find her and hurt her. She tried to drown herself in the bathtub the same evening.
In 1997, Amelia's clinicians recommended that she not have any visitation with her father. Amelia's in-home behavioral therapist, who saw her between February 1997 and January 1999, found it notable that Amelia never discussed her feelings towards her father until their last meeting. At this session, Amelia told the therapist that her father killed her best friend, Destiny, and that she saw her friend lying in a pool of blood. While the court did not admit this statement for the truth of the matter asserted, the therapist testified that this statement does demonstrate that Amelia is angry towards her father. The DCF social worker testified that Amelia is fearful of her father.
Nadine has lived with her paternal aunt and uncle since she was committed to DCF. In October of 1997, she refused to interact with her father during a meeting. When she was evaluated by Dr. David Mantell in January of 1998, he found her to be a fragile child who was strongly ambivalent about her father. While she expressed love for her father during her first visit with Dr. Mantell, she stated that she did not want to live with him. During her second visit with Dr. Mantell, Nadine expressed an aversion for her father and stated that she did not even want to see him. Dr. Mantell did not feel that she had been coached prior CT Page 630 to the second session. Nadine's foster mother told Dr. Mantell that Nadine had never spontaneously expressed interest in her father and was fearful of any visitation with him.
While Dr. Mantell found that Nadine had made remarkable developmental progress since her commitment, he considered her significantly at risk for both behavioral and emotional disorders because of her history and what appeared to be her fragile emotional condition. He also found that it did not make psychological sense "to allow a disturbed impaired parent to exercise visitation with a fragile child." In May of 1999, after a court ordered interactional evaluation, Nadine stated she was glad her father had left and that she was scared being in the same room with him.
Nadine considers her paternal aunt and uncle to be her psychological parents. These relatives would like to adopt both Nadine and Amelia. DCF plans to license Amelia's aunt and uncle as a therapeutic foster home and when Amelia is well enough, have her come live with her aunt and uncle and her sister.
Anthony was born on October 30, 1996. On December 20, 1996, he was hospitalized for failure to thrive and cachexia. Because he had not received adequate nutritional support, Anthony weighed less on the date he was hospitalized than he had weighed when he was born. He has been placed with the same foster family since he was two months old. They have attended to his multiple medical needs. They love Anthony and would like to adopt him. Anthony is closely bonded with this foster family as he has lived with them for almost his entire life. During a court ordered interactional evaluation, Dr. Freedman found that Anthony had no real relationship or comfort level with his father.
DEVONE W.
Devone has had numerous psychiatric hospitalizations and has had various diagnosis including paranoid schizophrenia, Bipolar, Borderline Personality Disorder, Antisocial Personality Disorder, and intermittent Explosive Personality Disorder.
In a court ordered psychiatric evaluation that took place in May of 1997, Dr. Kenneth Blatt diagnosed Devone with Intermittent Explosive Personality Disorder and Antisocial Personality. When Dr. Mantell evaluated Devone in January of 1998, he found he had "profound, chronically disabling psychological characteristics CT Page 631 that preclude a custodial role and probably preclude any meaningful and satisfying pattern of visitation for him with the child."
Devone has a criminal record that reflects a violent history. In 1995, he was convicted of assault on an officer, threatening and carrying a dangerous weapon. He was sentenced to one year in jail. In 1997, he was convicted on charges of interference and resistence, tampering with a motor vehicle, and failure to appear. He was sentenced to one year in jail.
On July 30, 1996, the court signed expectations for Devone. However, he was incarcerated at the time and it is unclear whether he was ever provided with these steps for reunification.
On June 16, 1998, the same day the court specifically ordered that continuing efforts for reunification were appropriate, DCF provided Devone with a letter attempting to offer him services consistent with those recommended in Dr. David Mantell's evaluation. The letter also stated that it understood that Devone was receiving psychiatric treatment from the Connecticut Mental Health Center and that it would like to confirm such services by his signing a release. On July 1, 1998, DCF reminded Devone by letter that he needed to contact DCF to set up a meeting to discuss services and to sign a release.[2] The letter specifically states that DCF is willing "to assist you in accessing such services." The social worker testified, however, that she had several conversations with Devone in which he continuously stated that he did not have any problems and that he did not need any services.
Devone recently took part in a court ordered evaluation in which he was described by Dr. Suzanne Derry as delusional and inappropriate. As recently as May of this year, the doctor described Devone as "unaware of any needs which the children might have. . . ." He was diagnosed with Mood Disorder, Intermittent Explosive Disorder and Mixed Personality Disorder with borderline and antisocial features.
RAYMOND J.
Raymond was first hospitalized when he was seventeen for a nervous breakdown. He has been diagnosed with schizophrenia and he has suffered from auditory and visual hallucinations. He has had multiple psychiatric hospitalizations. CT Page 632
Raymond never lived with Maria. After Anthony was born, Raymond asked for a paternity test which proved that he was the father of this child. He visited with the child intermittently. His last visit with Anthony was December of 1998. Raymond conceded to the court ordered evaluator, Dr. Freedman, that he understood that he was not in a position to take care of Anthony because of his psychiatric history as well as his history of drug and alcohol abuse.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that this parent is unable or unwilling to benefit from reunification efforts."Conn. Gen. Stat. § 17a-112 (c)(1).
The court finds by clear and convincing evidence that beginning in June of 1998 the Department made reasonable efforts to reunify Devone with his children. DCF offered to help access services for Devone, however, he repeatedly told DCF that he was not in need of any services. The court also finds by clear and convincing evidence that Devone was unwilling to benefit from reunification efforts because he repeatedly told the worker that there was nothing wrong with him and that he did not need services.
The court finds by clear and convincing evidence that DCF made reasonable efforts to reunite Raymond with Anthony and also finds that he was unable or unwilling to benefit from such services. Raymond was offered visitation with his son. He admitted to his court ordered evaluator that given his history he was not in a position to be the care giver for Anthony.
B. Statutory Grounds
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. §17a-112 (c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest CT Page 633 amendment. Practice Book § 33-3(a). The relevant date in this case is May 14, 1998.
FAILURE TO REHABILITATE
"A statutory ground for termination arises when the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112
(c)(3)(B). This statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child and further, that such rehabilitation must be foreseeable within a reasonable time." In re Luis C.,210 Conn. 157, 167 (1989).
No dispute exists that this court has previously found Amelia, Nadine and Anthony to have been neglected, thus satisfying a statutory prerequisite.
With regard to Devone, the court finds that the petitioner has not proven by clear and convincing evidence the statutory standard for failure to rehabilitate. As of May 14, 1998, the date the termination petition was filed, DCF had not offered Devone any services and it is unclear whether he was even provided with the steps for reunification. This is despite the fact that this father's whereabouts were known, he was not incarcerated for the majority of time the children were in DCF custody, and he was seeking visitation and reunification.
Even after Dr. Mantell recommended specific services in his evaluation in January of 1998, DCF did not offer any services prior to filing the termination petition. DCF cannot simply ignore a father who is making an effort to stay involved in his children's lives and who is seeking reunification. Because DCF failed to offer any services prior to filing the termination petition, and the court is limited to considering events prior to the filing of the petition at the adjudicatory stage, DCF cannot prevail on this adjudicatory ground.
With regard to Raymond, the court finds by clear and convincing evidence that he has failed to achieve such a degree of rehabilitation as would encourage the belief that within a CT Page 634 reasonable time, considering the age and needs of Anthony, he could assume a responsible position in the life of the child. Not only did Dr. Freedman find this to be the case, but also Raymond acknowledged that he could not be the primary caregiver of his child.
NO ONGOING PARENT/CHILD RELATIONSHIP
Petitioner also alleges that Devone has no ongoing parent/child relationship that ordinarily develops as the result of the parent having met on a day-to-day basis, the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent/child relationship would be detrimental to the best interest of the child. Conn. Gen. Stat. § 17a-112 (c)(3)(D). The Connecticut Supreme Court in In re Jessica M., 217 Conn. 459 (1991) found that termination on these grounds is inappropriate unless "the child has no present memories or feelings for the natural parent" or that if such child does have some memories, "no positive emotional aspects of the relationship survive." Id. at 468-70.
This is not a case like In re Valerie D., 223 Conn. 492 (1992), in which the child had absolutely no memories of her mother because she was immediately placed in foster care after being born. Instead, Amelia and Nadine have very strong feeling about their father. "In determining whether there is no ongoing parent-child relationship the court should consider the feelings of the child towards the parent especially if those feelings are positive rather than negative. In re Megan M., 24 Conn. App. 338,341 (1991). Amelia is fearful of her father. The last time she saw him she tried to drown herself that evening. In addition, her in-home behavioral therapist found it noteworthy that she did not mention or discuss her feelings towards her father.
Nadine is also fearful of her father. After doing a court ordered evaluation, Dr. Mantell recommended that Nadine not have any visitation with her father. At that time Dr. Mantell found that Nadine did not want to live with her father and that she did not even want to visit with him. Her foster mother stated that Nadine did not express interest in her father and was fearful of even having visitation with him. Based on all of the evidence presented, the court finds by clear and convincing evidence that with regard to both Amelia and Nadine, no positive emotional aspects of the relationship with their father survive and therefore there is no ongoing parent/child relationship. CT Page 635
Because the court has determined that no parent/child relationship exists, it must next consider whether to allow further time to develop such a relationship would be detrimental to the best interests of the children. In this case, further time would be detrimental to both Amelia and Nadine. Amelia has made progress in addressing her specialized needs. She is still, however, an extremely fragile child who needs consistency and calm in her environment. To force her to have a relationship with her father, who she is fearful of, would not be in her best interest. Nadine is very bonded to her foster parents and has lived with them over half her life. She has expressed fear about having to leave their home. "It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current `home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." Lehman v. Lycoming County Children's Services, supra, 458 U.S. 502, 513 (1982). Nadine needs and deserves permanency and to allow further time to attempt to develop a relationship with her father would not be in her best interest.
Accordingly, with regard to both Amelia and Nadine, the court finds by clear and convincing evidence that there is no ongoing parent/child relationship within the meaning of the statute.
ABANDONMENT
 Conn. Gen. Stat. § 17a-112 (c)(3)(A) provides that a ground for termination exists when "the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." "Attempts to achieve contact with the child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Migdalia,6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809 (1986). "Conversely, where a parent fails to visit a child, fails to display any level of affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209.
With regard to Raymond, the court finds by clear and convincing evidence that this father abandoned his child. "There are five CT Page 636 general obligations to parenthood: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to provide social and religious guidance." In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14 (1981). Raymond has never supplied food, clothing, medical care or an adequate domicile for this child. While he has sporadically visited with the child there has been no "continuing reasonable degree of concern." In re Migdalia,6 Conn. App. 194, 210 (1986). The court finds that Raymond has abandoned the child within the meaning of the statute.
MANDATORY FINDINGS
With respect to the mandatory factual findings required byConn. Gen. Stat. § 17a-112 (d), except in the case where termination is based on consent, the court makes the following findings:[3]
1. The timely nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
With regard to Devone, DCF attempted to provide visitation in 1996 while he was incarcerated. Because he was in the psychiatric ward, the prison did not allow visitation.
Subsequently, Amelia's therapist recommended that there not be any visitation. With regard to Nadine, Devone was prevented by a court order from seeing her until a court ordered psychiatric evaluation was completed. Dr. Mantell then recommended no further visits until Devone engaged in certain services including parenting and anger management. When DCF did attempt to assist this father with services beginning in June of 1998, Devone did not feel he was in need of any services.
With regard to Raymond, DCF did offer visitation with Anthony. Raymond has voluntarily chosen not to see Anthony since December of 1998.
2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980. CT Page 637
The court finds that DCF made reasonable efforts to reunite Devone with his children, but that he was unable or unwilling to benefit from services. When he was offered services in 1998, he did not cooperate in the implementation of such services because he did not believe that he was in need of them.
With regard to Raymond, DCF did provide visitation to this father and a psychological interactional evaluation. He was unable or unwilling to benefit from reunification efforts.
3. The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The court is not aware of any court orders entered into and agreed to by Devone or Raymond.
4. The feelings and emotional ties of the children with respect to their parents, any guardian and any person who has exercised physical care, custody or control of the children for at least one year and with whom the children have developed significant emotional ties.
All the children are bonded with and have significant emotional ties with their foster families. Amelia has negative feelings towards her father. Nadine has negative feelings towards her father. In a 1999, court ordered interactional evaluation between Devone and Nadine the psychologist described the relationship between Nadine and her father as bizarre and negative. She described the meeting between the two to be one of the most painful interactional visits she has ever witnessed. The father spent most of the meeting bragging about his alleged accomplishments and criticizing Nadine.
Anthony has no emotional tie with his father.
5. Ages of the children. Amelia is 10 years old. Nadine is 7 years old. Anthony is 3 years old.
6. The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (a) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child CT Page 638 with the parent, provided the court may give weight to the incidental visitations, communications, contributions, (b) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Devone has taken part in some administrative case reviews and has consistently sought visitation with Amelia and Nadine. Visitation has not been allowed on recommendation of Amelia's clinicians, court order and Dr. Mantell's recommendation regarding Nadine. When Devone was offered services in 1998, he did not believe he was in need of them.
Raymond has engaged in sporadic visitation but has not seen Anthony since December of 1998.
7. The extent to which a parent has been prevented from maintaining a relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Devone did not face unreasonable interference by DCF. While DCF attempted to provide visitation while Devone was incarcerated, the prison would not allow it. DCF, upon the recommendations of Amelia's clinicians, reasonably prevented visitation between Devone and Amelia.
With regard to Nadine, the court ordered no visitation until an evaluation was completed. Dr. Mantell then recommended that there not be further visitation. Accordingly, it was reasonable for DCF to deny visitation between Nadine and her father.
Anthony's father was allowed visitation and therefore there were no unreasonable acts preventing him from maintaining a relationship with Anthony. However, he had chosen not to see the child since December of 1998.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child."Conn. Gen. Stat. § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5. CT Page 639
The court finds by clear and convincing evidence that it is in the children's best interests for a termination of parental rights to enter with respect to the mother, Marie, and the male biological parents.
When Dr. Derry evaluated Devone, Nadine and Amelia this year, she found that both Amelia and Nadine have extremely negative feelings towards their father. She also found that Devone has "absolutely no awareness of his children as individuals free from his own delusions."
Devone continues to suffer from serious emotional problems that preclude his ability to safely and competently parent his children and understand their individualized needs. Amelia is "an emotionally fragile, mildly retarded youngster with many perceptual and language difficulties . . . who also suffers from severe anxiety secondary to a severe post-Traumatic Stress Disorder. . . ." Amelia is currently on several medications to help stabilize her behavior. Her father has made statements such as the medicine will mix with Amelia's Native American blood and have a demonic effect on her. He also told the court ordered evaluator that Amelia is brilliant and has the ability to act as an adult. It is clear that Devone has absolutely no awareness of his child's specialized needs. It is in Amelia's best interest to terminate her father's parental rights so that she can continue to live in a structured and nurturing environment with people who understand her problems and can help her in her struggle to overcome the many difficulties that she has faced in her short life.
When Nadine had to engage in an interactional evaluation in May of 1999, she subsequently told the social worker that she was scared and nervous being in the same room with her father and that she was glad he had left. She has also told her foster mother that she is fearful that she will be taken away from their home. Nadine deserves permanency and it is clearly in her best interest to terminate Devone's parental rights in order to allow her to be adopted by her aunt and uncle.
Accordingly, a termination of parental rights of Marie P., Devone W. and Raymond P. is ordered. It is further ordered that the Commissioner of DCF be appointed statutory parent for these children for the purpose of securing adoptive homes. The Commissioner shall file with this court no later than 60 days CT Page 640 following the date of judgment, a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
CHASE T. ROGERS JUDGE OF THE SUPERIOR COURT